Mark R. Gaylord (#5073)
Melanie J. Vartabedian (#10148)
Tesia N. Stanley (#13367)
Jeffrey D. Enquist (#14634)
BALLARD SPAHR LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, Utah 84111-2221
Telephone:  (801) 531-3000
Facsimile:  (801) 531-3001
gaylord@ballardspahr.com
vartabedianm@ballardspahr.com
stanleyt@ballardspahr.com
enquistj@ballardspahr.com

*Attorneys for Court-Appointed Receiver,
Diane A. Thompson*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DIANE A. THOMPSON, as Receiver for AMERICAN PENSION SERVICES, INC., a Utah corporation and its related entities,**<br><br>**Plaintiff,**<br>v.<br><br>**THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation.**<br><br>**Defendants.** | **COMPLAINT**<br><br>Case No.:  2:16-cv-00792-DBP<br><br>Magistrate Judge Dustin B. Pead |

Diane A. Thompson, as Court-appointed Receiver for American Pension Services, Inc. (the "Receiver" or "Plaintiff") and all related entities owned, controlled, or under common control by or through American Pension Services, Inc. (collectively, "APS"), by and through

undersigned counsel, hereby complains of Defendant the Corporation of the President of the Church of Jesus Christ of Latter-day Saints (the "Church"), as follows:

## INTRODUCTION

For well over a decade, Curtis DeYoung ("Curtis") engaged in a fraudulent scheme whereby he misappropriated approximately $24 million in funds from APS clients ("Account Owners"). During this same period of time, Curtis, along with his wife Michelle DeYoung ("Michelle"), donated a portion of these ill-gotten gains to the Church. This action seeks to recover the approximately $239,775 in charitable contributions the DeYoungs made to the Church.

Significantly, APS's former counsel and accountant have testified that Curtis misappropriated funds of the APS Account Owners. Curtis himself has admitted to this misappropriation and consented to the judgment in a case brought by the Securities and Exchange Commission ("SEC"), captioned *SEC v. American Pension Services, Inc.*, No. 2:14-cv-00309-RJS-DBP ("SEC Action"). In that consent to judgment, Curtis agreed to a disgorgement of funds misappropriated from APS Account Owners and the entry of civil penalties, and that for the purposes of the disgorgement and motion for civil penalties, the fraud allegations made by the SEC shall be accepted and deemed as true. The DeYoungs do not dispute they received exorbitant salaries, that by 2013, exceeded $520,000 per year.

As the Court-appointed Receiver, Ms. Thompson has a duty to "sue for and collect, recover, receive and take into possession from third parties" all Receivership Property for the benefit of APS and its Account Owners. *See* Receivership Order at ¶ 7.B. Accordingly, the Receiver brings this civil action against the Church to recover all charitable contributions

between January 2008 and April 24, 2014 to the Church from the ill-gotten gains Curtis and Michelle DeYoung misappropriated from innocent Account Owners.

## PARTIES

1. Plaintiff Diane A. Thompson is the Court-appointed Receiver for APS, and is a resident of Orange County, California.

2. APS is a Utah corporation with its principal place of business in Salt Lake County, Utah.

3. Upon information and belief, Defendant the Corporation of the President of the Church of Jesus Christ of Latter-day Saints is a Utah non-profit corporation with its principal place of business in Salt Lake County, Utah.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367 and ancillary federal jurisdiction over the claims asserted herein under *Merrill Scott & Assocs., Ltd. v. Concilium Ins. Servs.*, 253 Fed. App'x 756, 761 (10th Cir. 2007).

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 754 and 1391.

## GENERAL ALLEGATIONS

6. On April 24, 2014, the SEC filed a Complaint against Curtis and APS based on Curtis's "long-standing fraudulent scheme resulting in the misappropriation of over $22 million of investor funds." (SEC Action, Complaint, ¶ 1 (Dkt.1) ("SEC Complaint")).

7. On April 24, 2014, this Court appointed Diane A. Thompson to serve as Receiver for APS "for the purpose of marshaling and preserving all assets of [APS] together with any related entities owned, controlled, and/or under common control by or through [APS]" as well as

all assets that "were fraudulently transferred by APS and DeYoung and that are otherwise attributable to funds derived from clients or clients of APS and DeYoung." (*See* Receivership Order at pp. 1–2).

8. The Receiver is given broad powers to sue third parties to recover funds for the benefit of APS and its Account Owners. Pursuant to the Receivership Order, the Receiver has the duty to "use all reasonable efforts to determine the nature, location and value of all property interests of [APS] including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property')." (Receivership Order, Art. II, § 7.A). The Receiver is further permitted upon leave of Court "to sue for and collect, recover, receive and taking into possession from third parties all Receivership Property and records relevant thereto." (*Id.,* Art. II § 7.B; Art. X).

9. The American Pension Services Client Trust Accounting System ("APS Trust System") as well as the American Pension Services, Inc. Operating Accounting System ("APS Operating System") show that, as of April 25, 2014, the combined cash balance for all client accounts totaled $50,653,871.85. This total was the combined cash balance that should have been in the American Pension Services Master Trust Accounts ("APS Master Trust Accounts") as of the date the Receiver was appointed.

10. On April 25, 2014, when the APS Master Trust Accounts were frozen under the Receivership Order, the cash balance in the APS Master Trust Accounts at First Utah Bank

totaled only $26,067,278.61, leaving a cash shortfall in the APS Master Trust Accounts totaling approximately $24.6 million.

11. Curtis was the President, CEO, and sole shareholder of APS from 1982 to April 24, 2014, the date the Receiver was appointed.

12. Curtis and Michelle were married in 1978.

13. Michelle was employed on and off by APS from at least 1994 to April 24, 2014.

14. Michelle was the Secretary-Treasurer of APS from approximately 1994 to 2002.

15. Beginning in 2008, Michelle was employed as the Operations Manager of APS beginning in 2008. Michelle was APS's Operations Manager from 2008 to the appointment of the Receiver.

16. As the President, CEO, and sole shareholder, Curtis was the authorized signer on the APS Master Trust Accounts.

17. As early as 2000 and continuing thereafter, Curtis began misappropriating APS Account Owners' funds from the APS Master Trust Accounts.

18. Curtis used the misappropriated funds to, among other things, (a) invest in high-risk ventures for his and Michelle's benefit, (b) pay exorbitant salaries to himself and Michelle, (c) pay his personal expenses, and (d) make charitable contributions.

19. As a result of Curtis's misappropriation of monies from APS Account Owners, Curtis created a $24.6 million liability for APS, which rendered APS insolvent as early as January 2000 because its liabilities exceeded its assets.

20. From January 2000 through the appointment of the Receiver on April 24, 2014, APS's shortfall and insolvency grew to approximately $24.6 million (this period is hereinafter referred to as the "Loss Period").

21. In 2001, Curtis received $100,000 in compensation from APS. Curtis DeYoung's compensation at APS grew to $200,000 per year in 2006, $215,000 in 2007, $136,000 in 2008, $180,000 in 2009, $250,000 in 2010, $260,000 per year in 2011, $260,000 in 2012, $260,000 in 2013, and continued at a salary rate of $10,000 bi-weekly in 2014 until the entry of the Receivership Order.Michelle received $2,000 in February 2001 in the form of a draw on behalf of Curtis DeYoung, who was the sole shareholder of APS. A review of the APS accounting software indicated the reason for the draw as "salary." Michelle's compensation grew to $125,000 in 2008, $170,000 in 2009, $250,000 in 2010, $260,000 in 2011, $260,000 in 2012, $260,000 in 2013, and continued at a salary rate of $10,000 bi-weekly in 2014 until the entry of the Receivership Order.

22. In addition to the salaries paid to Curtis and Michelle, since 2001, Curtis withdrew cash from APS in the form of capital withdrawals totaling $1,377,090.62, which funds were deposited into his personal accounts.

23. Beginning in December 2008 and continuing through April 15, 2014, Curtis borrowed money from APS in the amount of $211,399, which funds were deposited into his personal accounts. These loans were never repaid and no reasonable consideration was exchanged.

24. During her employment at APS, and as a result of Curtis's misappropriation, Michelle reaped financial benefits in the form of salary and benefits that were only payable by

APS. Michelle used a portion of her salary while APS was insolvent to make charitable contributions to the Church.

25. Curtis's and Michelle's sole source of income were their exorbitant salaries paid by APS, as reported on their federal and state tax returns.

26. From their exorbitant salaries, draws, and loans received when APS was insolvent, the DeYoung's made the following charitable contributions to the Church:

- $15,450.00 in cash and $300.00 in stock in 2000.
- $600.00 in cash and $200.00 in stock in 2001.
- $540.00 to in 2002.
- $695.00 in 2003.
- $20,460.00 in 2004.
- $25,860.00 in 2005.
- $26,200.00 in 2006.
- $500.00 in 2007.
- $23,200.00 in 2008.
- $31,450.00 in 2010.
- $31,200.00 in 2011.
- $32,020.00 in 2012.
- $31,100.00 in 2013.

27. Curtis and Michelle reported the charitable contributions to the Church on their federal and state income tax returns. But for Curtis's unlawful and fraudulent activity, Curtis and Michelle could not have made those charitable contributions to the Church.

**A. The SEC Action.**

28.     On April 24, 2014, as a result of Curtis's misappropriation of APS Account Owners' funds, the SEC filed a complaint against APS and Curtis. In its complaint, the SEC outlined Curtis's misappropriation, which included using APS Account Owners' funds to invest in high-risk ventures. (SEC Action, Complaint, ¶¶ 47-98).

29.     When questioned by the SEC about the misappropriation of APS client funds during sworn testimony, Curtis DeYoung invoked his Fifth Amendment right against self-incrimination. (SEC Action, Complaint, ¶ 54; SEC Action, Deposition of Curtis L. DeYoung, September 30, 2014, at 94–100, 109–12, 155–62, 175–85, 222–23).

30.     Additionally, two other witnesses, B. Lamont Smith (APS's accountant) and Judson Pitts (APS's in-house counsel) testified that Curtis had misappropriated the approximately $24.7 million from APS Account Owners. (Deposition of B. Lamont Smith, *Thompson v. DeYoung*, No. 2:14-cv-00870-RJS, at 58–61 (D. Utah April 6, 2016); SEC Action, Deposition of Judson Pitts, at 5–19).

31.     In April 2016, Curtis agreed to settle with the SEC on the fraud charges alleged. As part of his settlement, Curtis signed a Consent to Entry of Judgment, wherein Curtis consented to a judgment that permanently restrained him from violations of the Securities Act and Exchange Act, and further ordered the disgorgement of $29,978,322.71. (Consent of Curtis L. DeYoung to Entry of Judgment, SEC Action (Dkt. 745), ¶ 2).

32.     In the Consent to Entry of Judgment, Curtis also agreed to the entry of a civil penalty, agreed that he was "precluded from arguing that he did not violate the federal securities laws as alleged" by the SEC. Curtis also agreed "the allegations of the [SEC] shall be accepted

as and deemed true," and that he would "withdraw[] any papers filed in this action to the extent they deny any allegation in the complaint." *Id.*, ¶¶ 3, 13.

33. On April 21, 2016, the United States District Court for the District of Utah entered Judgment against Curtis. (Dkt. 747).

**B. The Receiver Action**

34. On November 26, 2014, the Receiver filed a Complaint against Curtis and Michelle DeYoung, wherein the Receiver alleged, among other things, the DeYoung's violated the Utah Uniform Fraudulent Transfer Act, Utah Code Ann. § 25–6–1, *et seq. See* Complaint (Dkt. 1), *Thompson v. DeYoung*, No. 2:14-cv-00870-RJS (D. Utah Nov. 26, 2014) ("Ancillary Legal Action").

35. On November 30, 2015, the Receiver and Michelle executed a settlement agreement, wherein Michelle affirmed that she did not exchange reasonable equivalent value for her services in regards to a portion of her salary.

36. Furthermore, Michelle received and benefited from her exorbitant salary during periods that APS was insolvent.

**FIRST CLAIM FOR RELIEF**
**(Avoidance of Transfer - Violations of Utah's Uniform Fraudulent Transfer Act,**
**Utah Code Ann. § 25-6-1,** *et seq.***)**

37. All prior allegations are hereby incorporated as if fully stated herein.

38. APS became insolvent beginning in January 2000 when its liabilities exceeded the value of its assets at fair market value.

39. Despite APS's insolvency, Curtis and Michelle personally received no less than $3,308,000 from APS between January 2000 and April 24, 2014.

9

40. Monies paid to Curtis and Michelle, including their exorbitant salaries, were derived from and due to Curtis's fraudulent activity.

41. Curtis's and Michelle's sole source of income was from APS.

42. Between December 2008 and the date of the Receivership Order, Curtis borrowed approximately $211,399 from APS, which was deposited to his personal accounts and never repaid.

43. Curtis, as President, CEO, and sole shareholder of APS, committed fraud upon APS Account Owners by misappropriating funds from the APS Master Trust Accounts, which he used for his own personal benefit.

44. Curtis had sufficient knowledge that funds in the APS Master Trust Account were not his funds and were not available for his use. Despite Curtis's use of APS Master Trust Account funds, Curtis did knowingly falsify APS Account Owners' statements by over-stating the cash value of their accounts.

45. As a result of Curtis's misappropriation, Curtis and Michelle knew or should have known that APS was insolvent.

46. Despite APS's insolvency, Curtis continued to draw an exorbitant salary from APS, with the actual intent to hinder, delay, or defraud creditors.

47. Curtis has consented to a judgment against him and the Court has entered a Judgment, wherein Curtis has withdrawn all denials of the allegations set forth by the SEC and has accepted the allegations of the SEC as true.

48. The allegations made by the SEC include multiple allegations of fraud. According to the fraud allegations, Curtis falsified account records following his

misappropriation of APS Account Owners' funds.  Due to the misappropriation of APS Account Owners' funds, APS Account Owners constitute creditors of APS.

49.Curtis continued to receive an exorbitant salary while defrauding APS Account Owners.  This was done with the intent to hinder, delay, or defraud creditors – in this case APS Account Owners.

50.Likewise, Michelle continued to draw an exorbitant salary, and did so with the actual intent to hinder, delay, or defraud creditors.

51.In the alternative, Curtis and Michelle did not exchange reasonable equivalent value with APS in exchange for their salaries.

52.Curtis and Michelle caused no less than $239,775 of their fraudulently obtained funds to be donated to the Church in the form of charitable contributions from January 2000 through April 24, 2014.

53.The Church did not exchange reasonably equivalent value for these charitable contributions.

54.The Church is not entitled to the $239,775 in charitable contributions made by Curtis and Michelle that were the result of a fraudulent transfer.

55.As a result of fraudulent transfers, APS and its Account Owners have been damaged in amounts to be proven at trial, but not less than $239,775.

**SECOND CLAIM FOR RELIEF**
**(Unjust Enrichment)**

56.All prior allegations are hereby incorporated as though fully set forth herein.

57.APS and its Account Owners conferred a benefit upon the Church by transferring funds to Curtis and Michelle in the form of (a) misappropriated funds, (b) draws, (c) loans, and

11

(d) exorbitant salaries and compensation on the reasonable understanding and belief that Curtis and Michelle would tender reasonably equivalent professional services or consideration in exchange for the funds transferred.

58. Curtis committed fraud upon APS Account Owners during the time funds were transferred to the Church.

59. Curtis has agreed to a Judgment wherein he acknowledges the SEC's allegations, including allegations of fraud, as true.

60. Michelle has admitted she was the recipient of fraudulent transfers in the form of APS compensation during the Loss Period.

61. From Curtis and Michelle's compensation and misappropriated funds, APS and its Account Owners conferred a benefit upon the Church of at least $239,775.

62. The Church provided no value to APS or APS Account Owners during the Loss Period.

63. The Church at all times had an appreciation and knowledge of the benefit conferred upon it by APS and its Account Owners.

64. The Church's acceptance and retention of the benefit conferred upon it without paying for its value would be inequitable under the circumstances.

65. To avoid the Church's unjust enrichment, APS is entitled to recover in an amount to be proven at trial, but not less than $239,775.

**THIRD CLAIM FOR RELIEF**
**(Disgorgement of Ill-gotten Gains)**

66. All prior allegations are hereby incorporated as though fully set forth herein.

67. As set forth above, Curtis and Michelle engaged in a fraudulent scheme during which they received approximately $3,308,000 in compensation or other funds from APS while APS was insolvent.

68. Due to Curtis's misappropriation, a misappropriation that Michelle either knew of or should have known of, and the resulting insolvency, Curtis and Michelle did not exchange reasonably equivalent value with APS for their services.

69. Curtis and Michelle had no legal right to the compensation they received.

70. Curtis and Michelle caused no less than $239,775 to be transferred to the Church in the form of charitable contributions from funds that Curtis and Michelle were not entitled to possess.

71. Because Curtis and Michelle had no legal right whatsoever to receive the excessive monies—funds that Curtis and Michelle then used to make charitable contributions—it would be wholly inequitable for the Church to continue to possess these funds to the detriment of APS Account Owners.

72. Therefore, equity requires that the Church be disgorged of any such profits or ill-gotten gains attributable to Curtis's and Michelle's charitable contributions made from funds tainted by a fraudulent activities, including any interest that was earned or could have been earned on those funds.

73. Therefore, APS is entitled to recover in an amount to be proven at trial, but not less than $239,775, plus pre-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Diane A. Thompson, as Court-appointed Receiver for APS, prays for relief as follows:

    A.    For an order setting aside all fraudulent transfers described herein;

    B.    For damages in an amount to be proven at trial, but not less than $239,775, plus prejudgment interest thereon;

    C.    For costs, attorneys' fees, and interest recoverable by law;

    D.    Such other and further relief as the Court deems just and equitable.

DATED this 14th day of July, 2016.

/s/ Mark R. Gaylord
Mark R. Gaylord, Esq.
Melanie J. Vartabedian, Esq.
Tesia N. Stanley, Esq.
Jeffrey D. Enquist, Esq.
BALLARD SPAHR LLP
*Attorneys for the Court-Appointed Receiver, Diane A. Thompson*

Plaintiff's address:
Diane A. Thompson, as Receiver for
American Pension Services, Inc.
c/o Ballard Spahr LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, Utah 84111-2221